UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )   Case No.<br>) |
| ARO EQUITY, LLC,<br>THOMAS D. RENISON and<br>TIMOTHY J. ALLCOTT, | )   JURY TRIAL DEMANDED<br>)<br>)<br>) |
| Defendants. | )<br>) |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("the Commission") alleges the following against defendants ARO Equity, LLC, Thomas D. Renison, and Timothy J. Allcott, and demands a jury trial.

## PRELIMINARY STATEMENT

1. This enforcement action involves a fraudulent solicitation by an investor adviser, ARO Equity, and two of its principals, Renison and Allcott. Between July 2015 and January 2018, Renison and Allcott raised more than $6 million from at least fifteen investors, nearly all of whom are senior citizens. Renison and Allcott provided the investors with promissory notes issued by ARO Equity. The notes had terms of three to five years, and the interest rate was 8% to 12% per year. Renison and Allcott told investors that the return on ARO Equity promissory notes was far superior to the returns on their current retirement products. They told investors that their money would be safe with ARO Equity (as safe as being in a bank, according to

Renison), that there was no downside to an investment in ARO Equity, and that ARO Equity had not experienced any losses.

2.     The defendants' statements to investors were materially false and misleading. An investment in ARO Equity was not safe in any sense. Renison and Allcott used the investors' money to fund several small New England businesses that had yet to turn a profit. ARO Equity used approximately $3.3 million of the investors' money to acquire one business and make loans to two others. ARO Equity did not come close to breaking even on its involvement with any of the businesses. It sold the first business for a net loss of more than $1.3 million. As of June 2018, when it stopped receiving any repayments, it had loaned approximately $2 million to the other two businesses and had only recovered approximately $410,000.

3.     By the time the fraud was uncovered in early 2018, Renison had collected nearly $580,000 in finder's fees from ARO Equity based on his solicitation of investors, and Allcott had received a total salary of approximately $255,000. In addition, ARO Equity used investor funds to pay more than $100,000 to Renison's sons. ARO Equity paid a total of approximately $1 million to investors. ARO Equity has nothing left to repay the investors, who have lost a total of approximately $5 million in principal.

4.     Through the activities alleged in this Complaint, the defendants engaged in: (a) fraud in the offer or sale of securities, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)]; (b) fraud in connection with the purchase or sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]; (c) fraudulent or deceptive conduct with respect to investment advisory clients, in violation of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§80b-6(1) & (2)]; and (d) the sale of unregistered securities, in violation of Sections 5(a) and 5(c) of the Securities

Act [15 U.S.C. §§77c(a) & (c)].  In addition, Renison acted as an unregistered broker, in violation of Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)].

5. The Commission seeks:  (a) a permanent injunction prohibiting the defendants from further violations of the relevant provisions of the federal securities laws; (b) disgorgement of the defendants' ill-gotten gains, plus prejudgment interest; and (c) civil penalties due to the egregious nature of the defendants' violations.

## JURISDICTION AND VENUE

6. The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. §80b-9(d)].

7. This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d), 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78u(aa)], and Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§80b-9(d), 80b-9(e), 80b-14].

8. Venue is proper in this District because defendant ARO Equity is organized here and defendant Allcott lives here.

9. In connection with the conduct alleged in this Complaint, the defendants directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

10. The defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

11.     **ARO Equity, LLC** ("ARO Equity") is a limited liability company organized in Massachusetts that characterizes itself as a private investment firm. The firm's office is located in a home that Allcott shares with his domestic partner in Peabody, Massachusetts.

12.     **Thomas David Renison** ("Renison"), age 64, lives in South Glastonbury, Connecticut. Renison is a licensed insurance agent in Connecticut. Between 1990 and 2010 he was affiliated with a series of financial services companies. In 2012, the Maine Securities Administrator barred him from associating with an issuer of securities, an investment adviser, or a brokerage firm, based on a finding that he had engaged in a scheme to defraud one of his advisory clients through the sale of a promissory note to help fund a fictitious European casino. In July 2014, the Commission barred Renison from association with an investment adviser, brokerage firm, and certain other types of financial services company. In October 2015, Renison filed for personal bankruptcy in order to discharge an order to pay more than $1.4 million of restitution to a former client.

13.     **Timothy James Allcott** ("Allcott"), age 58, lives in Peabody, Massachusetts. Before he got involved with ARO Equity in July 2015, he had been largely unemployed for several years. He previously managed a billiards hall and a motel.

## FACTUAL ALLEGATIONS

**Formation of ARO Equity**

14.     In July 2015, Renison, Allcott, and Allcott's domestic partner formed a company to solicit money from investors and use the investors' money to fund small businesses in New England. The three men agreed that Renison would have a 50% interest in the firm, and Allcott and his partner would share a 50% interest. Because the Commission had previously barred

Renison from associating with an investment adviser, it was essential to conceal Renison's role in the firm. To this end, the three owners had a bogus Operating Agreement prepared. The document purported to show that Allcott and his partner owned 95% of the firm and one of Renison's sons owned the other 5%.

15. Renison had primary responsibility for soliciting prospective investors in ARO Equity. Prior to being barred by the Commission in July 2014, Renison owned and operated a company called Connecticut Financial Group ("CFG"), which he used to sell insurance products and advise clients on retirement investments. When soliciting investors for ARO Equity, Renison preyed on many of his former clients from CFG, most of whom were elderly, unsophisticated investors. Renison received a 10% finder's fee from ARO Equity for the funds that he raised from investors. Renison also received an annual 2% fee on the aggregate amount he had raised from investors.

16. Allcott also solicited prospective investors in ARO Equity, and he handled the firm's communications with current investors. (Allcott's domestic partner handled the bookkeeping and did not directly solicit or communicate with investors.)

17. Renison and Allcott offered to sell investors promissory notes issued by ARO Equity with terms of three to five years and stated returns of 8% to 12% per year. Knowing that many of the investors whom they solicited would be retirees, Renison and Allcott made arrangements with a third-party custodial firm so that investors could transfer qualified retirement funds from their current accounts to new self-directed IRA accounts, which would be invested in ARO Equity promissory notes.

18. In October 2015, ARO Equity created a webpage touting itself as a private investment firm that provided funding for businesses throughout New England.

**ARO Equity's Failure to Earn a Profit**

19. In August 2015, shortly after receiving more than $775,000 from its first investor, ARO Equity spent $600,000 to acquire a company based in North Andover, Massachusetts, that made electrical equipment. Between October 2015 and August 2016, ARO Equity sank an additional $750,000 into the company to fund its ongoing operations. Nevertheless, the company lost money on a monthly basis. In March 2017, ARO Equity sold the company back to the previous owner for $70,000. ARO Equity thus spent a total of $1,350,000 on the electrical equipment company and recovered only approximately $16,000 after paying legal and other fees related to the sale, for a net loss of more than $1.3 million.

20. In April 2016, ARO Equity entered into a joint venture agreement with a contracting company based in Waltham, Massachusetts, that performed construction work at certain U.S. military facilities. Under the agreement, ARO Equity was to fund some of the company's operations and was entitled to 70% of the profits from those operations, measured at the end of each fiscal year. Between May 2016 and June 2017, ARO Equity loaned a total of approximately $373,000 to the company. In return, ARO Equity received only a single payment of $25,000 in February 2017. ARO Equity thus suffered a net loss on its loans to the military contractor of approximately $348,000.

21. Also in April 2016, ARO Equity created a limited liability company to manage a small network of walk-in clinics in Connecticut. Allcott was the company's manager; one of his business acquaintances was the chief executive officer. ARO Equity held an 80% interest in the business. Between August 2016 and February 2018, ARO Equity loaned a total of approximately $1,651,000 to the company and received a total of approximately $384,000 in return. ARO Equity thus suffered a net loss on its loans to the medical management company of approximately $1,267,000.

**Fraudulent Solicitation of Investors in ARO Equity**

22.     Renison met with prospective investors face to face, usually at an investor's home.  He told investors that he was familiar with, but was not associated with, ARO Equity.  He told investors that ARO Equity provided funding to businesses in New England.  He told investors that the return on ARO Equity promissory notes was far superior to the returns on their current retirement products.  He told investors that their money would be "safe" with ARO Equity (as safe as being in a bank) and that there was no downside to an investment in ARO Equity.  Although Renison did most of the fundraising for ARO Equity, Allcott raised more than $400,000 from at least two investors using the same sales pitch that Renison used.  After ARO Equity acquired the electrical equipment company, Renison and Allcott began telling investors that ARO Equity had not experienced any losses.  Those statements to investors were materially false and misleading.  Renison was not just familiar with ARO Equity – he owned 50% of the company.  An investment in ARO Equity was not as safe as the investors' previous retirement products – the firm used the investors' money to fund small businesses that had yet to turn a profit.  ARO Equity's operations were not profitable – the firm pumped a total of approximately $3.4 million into three businesses and recovered a total of approximately $480,000.

23.     In early 2017, Allcott sent a letter to a prospective investor who was one of Renison's insurance clients and whom Renison had already approached on behalf of ARO Equity.  In the letter, Allcott stated, "We have worked with Tom for a number of years and he has been so graciously supportive we look to do whatever we can for him and his clients."  Allcott also stated:

> As Tom mentioned, we are modelled after the highly successful [name of private equity firm] (over $1.5 Billion invested) and seek their advice and input on every investment.  They have returned consistent double digit returns on new Investments (over the last 5 years

> averaging above 75%!). We have been able to duplicate that success and plan to continue to do so!

Allcott knew or was reckless in not knowing that those statements were materially false and misleading. Renison did not just "work with" ARO Equity, he owned a 50% interest in the firm, but his ownership was concealed from the public because the Commission had barred him from associating with an investment adviser. ARO Equity did not seek advice and input from the private equity firm on any of its investments. ARO Equity did not earn "double digit" returns on its investments. In fact, ARO Equity did not earn any returns at all on its investments. When Allcott sent the letter to the prospective investor, ARO Equity had advanced approximately $1.4 million to the electrical equipment company and had received only a single payment of $6,072. Likewise, at that time, ARO Equity had loaned approximately $340,000 to the military contractor and had received only a single payment of $25,000.

24. On March 23, 2017, Allcott as manager of ARO Equity executed a five-year promissory note for an $183,000 investment by a new investor. The interest rate was 10% per year, payable monthly. The note stated, "ARO hereby confirms that these funds will be used to purchase goods and services which will be supplied/resold to the US Government, it's [sic] agencies or armed forces." Shortly thereafter, Allcott sent a letter to the investor thanking him for the investment. Allcott stated, "In order to 'jump-start' your earnings, beyond of course the 10% annual return, we placed your capital alongside ours into 2 ongoing projects [of the military contractor]. By doing this your money began earning immediately as opposed to waiting until [the contractor] won the next contract." Allcott knew or was reckless in not knowing that those statements were materially false and misleading. After it received $183,000 from the investor in March 2017, ARO Equity waited six weeks before making another loan to the military

contractor. It loaned $15,000 in May 2017 and $15,000 in June 2017. It then suspended its efforts to fund the contractor's operations.

25. In mid-2017, one investor inherited approximately $1 million from her father's trust. Renison had been her parents' financial adviser. Renison suggested that she invest her entire inheritance with ARO Equity. The investor followed Renison's advice and invested the entire $1 million in ARO Equity. On August 7, 2017, Allcott as manager of ARO Equity executed a five-year promissory note for $1 million. The interest rate was 8% per year, payable monthly. The note stated, "The Borrower confirms that the funds will be used in support of [the military contractor]." Allcott knew or was reckless in not knowing that the statement was materially false and misleading. ARO Equity had not made a loan to the military contractor since June 1, 2017, and ARO Equity did not make any additional loans to the contractor after receiving $1 million from this investor.

**The Defendants' Gains and the Investors' Losses**

26. By the time the fraud was uncovered in early 2018, Renison had collected nearly $600,000 in finder's fees from ARO Equity based on his solicitation of investors, and Allcott had received a total salary of nearly $100,000. In addition, ARO Equity used investor funds to pay $150,000 to Renison's sons.

27. Between July 2015 and January 2018, Renison and Allcott raised approximately $6.1 million from at least fifteen investors in ARO Equity. Between August 2015 and June 2018, ARO Equity paid a total of approximately $1.1 million to investors. ARO Equity has nothing left to repay the investors, who have lost a total of approximately $5 million.

**FIRST CLAIM FOR RELIEF**
**(Violation of Section 17(a) of the Securities Act by All Defendants)**

28. The Commission repeats and incorporates by reference the allegations in paragraphs 1-27 of the Complaint as if set forth fully herein.

29. The promissory notes offered by ARO Equity constitute a "security" for purposes of Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

30. Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] makes it unlawful for any person, directly and indirectly, acting intentionally, knowingly or recklessly, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities: (a) to employ devices, schemes or artifices to defraud; (b) to obtain money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in transactions, practices or courses of business which operate as a fraud or deceit upon purchasers of the securities.

31. The defendants' misconduct as set forth above was in the offer or sale of a security.

32. In light of the foregoing, the defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

**SECOND CLAIM FOR RELIEF**
**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 by All Defendants)**

33. The Commission repeats and incorporates by reference the allegations in paragraphs 1-27 above.

34. The promissory notes offered by ARO Equity constitute a "security" for purposes of Section 3(a)(10) of the Exchange Act [15 U.S.C. §78c(a)(10)].

35. Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5] make it unlawful for any person, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) to employ devices, schemes or artifices to defraud; (b) to make untrue statements of material fact or omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

36. The defendants' misconduct as set forth above was in connection with the purchase or sale of a security.

37. In light of the foregoing, the defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act and Rule 10b-5.

**THIRD CLAIM FOR RELIEF**
**(Violation of Sections 206(1) and 206(2) of the Advisers Act by All Defendants)**

38. The Commission repeats and incorporates by reference the allegations in paragraphs 1-27 above.

39. At all relevant times, each defendant was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].

40. Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1), 80b-6(2)] provide that it is unlawful for an investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly: (1) to employ any device, scheme, or artifice to defraud a client or prospective client; or (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon a client or prospective client.

41. As a result of the misconduct alleged above, the defendants have violated and, unless enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act.

### FOURTH CLAIM FOR RELIEF
### (Violation of Section 5(a) of the Securities Act by All Defendants)

42. The Commission repeats and incorporates by reference the allegations in paragraphs 1-27 of the Complaint as if set forth fully herein.

43. ARO Equity has never been registered with the Commission, and it has never registered or attempted to register any offering of securities under the Securities Act or any class of securities under the Exchange Act.

44. The defendants, directly or indirectly: (a) have made or are making use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) have made or are making use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

45. As a result of the misconduct alleged above, the defendants have violated and, unless enjoined, will continue to violate Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

### FIFTH CLAIM FOR RELIEF
### (Violation of Section 15(a) of the Exchange Act by Renison)

46. The Commission repeats and incorporates by reference the allegations in paragraphs 1-27 of the Complaint as if set forth fully herein.

47. At all relevant times, Renison acted as a "broker" within the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. §78c(a)(4).]

48. When he solicited investors in ARO Equity, Renison was not personally registered with the Commission as a broker-dealer, and he was not associated with a registered broker-dealer.

49. Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)] provides that it is unlawful for a broker who is a natural person not associated with a registered broker or dealer to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security unless such broker is registered in accordance with Section 15(b) of the Exchange Act [15 U.S.C. §78o(b)].

50. As a result of the misconduct alleged above, Renison has violated and, unless enjoined, will continue to violate Section 15(a) of the Exchange Act.

### SIXTH CLAIM FOR RELIEF
**(Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act by Renison and Allcott)**

51. The Commission repeats and incorporates by reference the allegations in paragraphs 1-27 of the Complaint as if set forth fully herein.

52. As set forth above, ARO Equity violated Sections 206(1) and 206(2) of the Advisers Act.

53. By engaging in the conduct described above, Renison and Allcott knowingly and substantially aided and abetted ARO Equity's violations of Sections 206(1) and 206(2) of the Advisers Act.

### PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A. Enter a permanent injunction restraining the defendants, as well as their agents, servants, employees, attorneys, and other persons in active concert or participation with them, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of:

1. Section 17(a) of the Securities Act [15 U.S.C. §77q(a)];

2. Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

3. Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1)];

4. Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a), (c)]; and

5. Section 15(a) of the Exchange Act [15 U.S.C. 78o(a)] as to Renison only.

B. Require the defendants to disgorge their ill-gotten gains, plus prejudgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

C. Order the defendants to pay appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)];

D. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E. Award such other and further relief as the Court deems just and proper.

          Respectfully submitted,

          /s/ Frank C. Huntington
          Frank C. Huntington  (Mass. Bar No. 544045)
           Senior Trial Counsel
          Eric Brooks  (Cal. Bar. No. 209153)
           Senior Counsel
          Martin F. Healey  (Mass. Bar No. 227550)
           Regional Trial Counsel
          Attorneys for Plaintiff

                **SECURITIES AND EXCHANGE COMMISSION**
                Boston Regional Office
                33 Arch Street
                Boston, MA  02110
                (617) 573-8960  (Huntington direct)
                (617) 573-4590  (fax)
                huntingtonf@sec.gov  (Huntington email)

Dated:  January 8, 2020